# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————

**No. 201600053**

———————————

## UNITED STATES OF AMERICA
Appellee

v.

## DARRIUS D. UPSHAW
Hospital Corpsman Third Class (E-4), U.S. Navy
Appellant

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Major M. Sameit, USMC.
Convening Authority: Commanding General, U.S. Marine Corps
Forces, Special Operations Command, Camp Lejeune, NC.
Staff Judge Advocate's Recommendation: Lieutenant Colonel J.E.
Glavin, USMC.
For Appellant: William E. Cassara, Esq.; Lieutenant Jacob E.
Meusch, JAGC, USN.
For Appellee: Lieutenant Commander Jeremy R. Brooks, JAGC,
USN; Lieutenant Robert J. Miller, JAGC, USN.

———————————

Decided 31 May 2017

———————————

Before MARKS, RUGH, and JONES, *Appellate Military Judges*

———————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————

MARKS, Senior Judge:

A general court-martial comprised of members with enlisted representation convicted the appellant, contrary to his pleas, of two specifications of abusive sexual contact and one specification of sexual assault, in violation of Article 120, Uniform Code of Military Justice (UCMJ),

10 U.S.C. § 920 (2012).[1] The members sentenced the appellant to 10 years' confinement, reduction to pay grade E-1, total forfeitures, and a dishonorable discharge. The convening authority (CA) approved the sentence as adjudged and, except for the punitive discharge, ordered the sentence executed.

The appellant raises four assignments of error (AOE)[2]: (1) the evidence is factually insufficient to sustain a conviction for sexual assault; (2) the military judge erred in refusing to admit evidence of artwork at the appellant's apartment admissible under a relevance standard to show that the alleged victim was aware of the appellant's sexual orientation; (3) the military judge erred in giving an instruction on variance for the sexual assault charge, as the variance was a different substantive act and prejudiced the appellant's ability to defend against the charge; and (4) the military judge erred in allowing the government to use charged sexual misconduct as propensity evidence for other charged sexual misconduct.

We find merit in the final AOE regarding the use of charged sexual misconduct as propensity evidence. Weighing the prejudice of the error, we affirm the appellant's two convictions for abusive sexual contact but set aside the conviction for sexual assault. However, we do not find the sexual assault conviction to be factually insufficient (the first AOE) and thus order it remanded with authorization for a rehearing. This renders the two remaining AOEs moot.

## I. BACKGROUND

The appellant, a Hospital Corpsman Third Class stationed at Camp Pendleton, California, was tried for two unrelated allegations of sexual assault of male Marines. He was under investigation for sexually assaulting a Marine on 31 October 2014 when another Marine accused him of sexual assault on 1 March 2015. The two alleged victims did not know each other.

Despite some substantive differences in the allegations, circumstances surrounding them were very similar. The appellant met both victims at the same Oceanside, California, bar. Both victims had been drinking for hours and were already very intoxicated when the appellant supplied them with

---

[1] The members acquitted the appellant of one specification of abusive sexual contact. The military judge consolidated two specifications of abusive sexual contact and two specifications of sexual assault into single specifications of abusive sexual contact and sexual assault because they constituted unreasonable multiplications of charges for findings.

[2] The appellant raised the first three in his original Assignments of Error and moved to submit the fourth in Appellant's Motion for Leave to File Supplemental Assignment of Error and Supplemental Assignment of Error, which we granted on 6 March 2017.

more alcohol. When both victims were ready to sleep off their inebriation, the appellant offered them rides to the barracks and his apartment, respectively. Both victims awoke to either sexual contact or a sexual act. Both sought help escaping the appellant, displaying noticeable shock and distress to witnesses.

Trial counsel filed a pretrial motion to admit evidence of the two incidents under MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 413,[3] SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). To demonstrate the probative weight of the evidence, trial counsel proffered the parallels they would draw between the two allegations at trial. Trial defense counsel objected to the admission of charged misconduct as propensity evidence, arguing that it "strips the accused of his constitutionally guaranteed presumption of innocence on all charges" and "relieves the government of its burden to prove every element of every charged offense beyond a reasonable doubt."[4] Relying on the state of case law at the time, the military judge admitted the evidence pursuant to MIL. R. EVID. 413.

## II. DISCUSSION

In light of the subsequent Court of Appeals for the Armed Forces' (CAAF) decision in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016), the appellant again challenges the admission of charged sexual misconduct as evidence of his propensity to commit sexual assault under MIL. R. EVID. 413.

"A military judge's decision to admit evidence is reviewed for an abuse of discretion." *Hills*, 75 M.J. at 354 (citation omitted). But "[t]he meaning and scope of [MIL. R. EVID.] 413 is a question of law that we review *de novo*." *Id.* (citing *LRM v. Kastenberg*, 72 M.J. 364, 369 (C.A.A.F. 2013)). In *Hills*, the CAAF held the military judge erred in interpreting MIL. R. EVID. 413 to encompass charged sexual misconduct and abused his discretion by admitting it as evidence under the rule. We find the same error and abuse of discretion in the military judge's admission of charged misconduct as propensity evidence in this case.

In both *Hills* and this case, the erroneous interpretation of MIL. R. EVID. 413 manifested in the members' instructions. Instructional error is subject to *de novo* review. *Id.* at 357.

---

[3] Appellate Exhibit (AE) XVI. The motion prayed for admission of the evidence under MIL. R. EVID. 404(b) should the military judge determine it was inadmissible under MIL. R. EVID. 413.

[4] AE IX at 2.

The *Hills* court found error in instructions advising members how to consider evidence admitted pursuant to MIL. R. EVID. 413.[5] *Id.* Specifically, the instructions "violated Appellant's presumption of innocence and right to have all findings made clearly beyond a reasonable doubt, resulting in constitutional error." *Id.* at 356. Constitutional error in instructions "'must be tested for prejudice under the standard of harmless beyond a reasonable doubt.'" *Id.* at 357 (quoting *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006)). "An error is not harmless beyond a reasonable doubt when 'there is a reasonable possibility that the [error] complained of might have contributed to the conviction.'" *Id.* at 357-58 (quoting *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007)); *see also United States v. Hukill*, __ M.J. __, 2017 CAAF LEXIS 305, at *6 (C.A.A.F. May 2, 2017). "'To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *United States v. Othuru*, 65 M.J. 375, 377 (C.A.A.F. 2007) (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991)).

The military judge in the case before us read substantially the same instruction at issue in *Hills*, "invit[ing] the members to bootstrap their ultimate determination of the accused's guilt with respect to one offense using the preponderance of the evidence burden of proof with respect to

---

[5] The military judge in *Hills* instructed members

that evidence that Appellant committed one of the charged sexual assaults :

may have a bearing on your deliberations in relation to the other charged sexual assault offenses . . . only under the circumstances I am about to describe:

First, you must determine by a preponderance of evidence that it is more likely than not that the sexual assault offense occurred;

If you determine by a preponderance of the evidence that one or more of the offenses alleged in Specifications 1, 2, or 3 of the Charge occurred, even if you are not convinced beyond a reasonable doubt that the accused is guilty of one or more of those offenses, you may nonetheless consider the evidence of such offenses, or its bearing on any matter to which it is relevant in relation to the other sexual assault offenses;

You may also consider the evidence of such other acts of sexual assault for its tendency, if any, to show the accused's propensity to engage in sexual assault."

*Hills*, 75 M.J. at 356 (ellipsis in original).

another offense." *Hills*, 75 M.J. at 357. We conclude the military judge's instructions were erroneous in a way that infringed upon the appellant's constitutional rights.

We must now determine whether the erroneous instructions inviting members to consider charged sexual misconduct as evidence of a propensity to commit sexual assault might have contributed to the appellant's convictions. We do so by weighing the government's use of propensity evidence and the strength of the allegations against the appellant absent propensity evidence.

**A. Trial counsel's presentation of propensity evidence**

First, we consider the trial counsel's robust use of MIL. R. EVID. 413 and propensity evidence in prosecuting this case. The government's silence about propensity evidence and MIL. R. EVID. 413 is an important factor in determining whether the associated errors were harmless. *See United States v. Luna*, No. 201500423, 2017 CCA LEXIS 314, at *18, unpublished op. (N-M. Ct. Crim. App. 9 May 2017) (finding harmless error when trial counsel did not reference propensity in closing arguments and instead emphasized the government's burden to prove every element beyond a reasonable doubt); *United States v. Bonilla*, No. 20131084, 2016 CCA LEXIS 590, at *25, unpublished op. (A. Ct. Crim. App. 30 Sep 2016) (citing trial counsel's failure to reference propensity evidence in his argument as one of the factors convincing the court the instruction did not contribute to the verdict), *aff'd*, 2017 CAAF LEXIS 352 (C.A.A.F. May 3, 2017) (summary disposition); *United States v. Harrison*, No. 38745, 2016 CCA LEXIS 431, at *35, unpublished op. (A.F.C.C.A. 20 Jul 2016) (finding harmless error when trial counsel not only declined to focus on propensity evidence but also "specifically distanced the Government from any argument regarding Appellant's predisposition to commit sexual misconduct."), *aff'd*, 76 M.J. 127 (C.A.A.F. 2017) (summary disposition). *Cf United States v. Gonzales*, No. 20130849, 2017 CCA LEXIS 128, at *7 (A. Ct. Crim. App. 22 Feb 2017) (setting aside the findings and sentence based on the erroneous propensity instructions and a government closing argument stressing the importance of the propensity evidence).

Here, the trial counsel did not hesitate to incorporate propensity evidence and MIL. R. EVID. 413 into the government's trial strategy. They capitalized on the parallels between the two Marines' allegations as evidence of the appellant's predisposition to commit sexual assault. Trial counsel began his opening statement by introducing the two alleged victims, Lance Corporal (LCpl) K.L.M. and Corporal (Cpl) K.I., as a pair of Marines whose experiences

with the appellant were interchangeable: "In a snapshot, the events leading up to the sexual assaults is [sic] the same."[6]

At the beginning of his closing argument, trial counsel returned to the link between LCpl K.L.M. and Cpl K.I.: "K.L.M. and K.I., they don't know each other. They have never heard of each other. Members, the accused isn't unlucky. He didn't just fall into unfortunate circumstances. The accused is the link."[7] Trial counsel then focused the members on the propensity instruction with his own explanation:

> The military judge instructed you about propensity, members, and that's what makes this trial unique. These cases are connected[,] and they are connected only by the accused's involvement.
>
> What did he tell you? He said that if you find that an offense occurred, whether that be grabbing the penis, rubbing the thigh and the groin, or penetrating the anus, you may use that on any other point to which it is relevant if you find that that initial charge was just by a preponderance of the evidence.
>
> So if you find that by a preponderance of the evidence the accused grabbed K.L.M.'s penis, Specification 2 of Charge I, simply by a preponderance of the evidence, you may use that— you may even use that to find that he has a predisposition to engage in sexual assault. So if you find that any one of these things happened by a preponderance of the evidence, you can use that to find that he is the type of person that does these things.[8]

As he transitioned from one alleged offense to another, trial counsel reminded the members they only needed to reach the preponderance standard to build a bridge between the two charges.

> Remember that propensity instruction though. If you believe by a preponderance of the evidence that that first [abusive sexual contact] happened, you can use that for the second.[9]
>
> . . .

---

[6] Record at 334.

[7] *Id.* at 643.

[8] *Id.* at 643-44.

[9] *Id.* at 647.

> And, members, keep in mind, once you find by a preponderance of the evidence that any of the offenses have occurred, you can use that evidence to draw the conclusion that he is the type of person that commits these acts.[10]

The trial defense counsel also explained the propensity instruction:

> I want to talk a little bit about the government's burden of proof. Preponderance of the evidence, it's more likely than not. That's what you have to find first, on one of these, if you are going to try to use if for another. Pay close attention to that spill-over instruction.[11]

Finally, in rebuttal argument, trial counsel focused the members again on the commonalities between the two incidents.

> The accused went to the bar, he found a vulnerable Marine, he sidled up to that Marine, he identified himself as a corpsman, he offered that safe sober ride, and then he assaulted the Marine.

> And then, while under investigation for the first incident, he does it again. Same thing. He goes to a bar, sidles up to a Marine, safe sober ride, and he assaults him. It's what he does. That's the type of person he is.[12]

Then trial counsel ended his argument with the appellant's propensity to commit sexual assault: "Are there people in our world with a propensity for sexual assault? Yes, there are. Is Petty Officer Upshaw one of those people? Yes, he is."[13]

Trial counsel repeatedly emphasized the similarities between the two incidents and invited the members to find predisposition and propensity in the appellant's conduct. We now look at the strength of the evidence to determine whether "that error [was] unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Othuru*, 65 M.J. at 377.

## B. Strength of the evidence

*1. LCpl K.L.M.*

---

[10] *Id.* at 651.

[11] *Id.* at 664.

[12] *Id.* at 670.

[13] *Id.* at 671.

The afternoon of 30 October 2014, LCpl K.L.M. left his barracks at Camp Pendleton, California, and caught a ride with a friend to a bar in nearby Oceanside, California. LCpl K.L.M. planned to meet a girl with whom he was communicating via an online dating application. Upon arrival, LCpl K.L.M. began drinking alcohol. Over the course of the evening, the appellant struck up a conversation with LCpl K.L.M., introducing himself as a corpsman[14]. The appellant bought LCpl K.L.M. a "Vegas Bomb," a cocktail consisting of four shots of hard liquor.[15] Around midnight, LCpl K.L.M. was "extremely intoxicated"[16] and ready to go home. The appellant offered him a ride back to his barracks. On their way to the appellant's car, LCpl K.L.M., another man from the bar, and the appellant stepped inside a sex shop for about two minutes "for just laughs and gags."[17] The appellant then helped LCpl K.L.M. into the front passenger seat of his car and reclined the seat so LCpl K.L.M. could sleep. LCpl K.L.M. remembered the appellant waking him "to show consciousness"[18] as they passed through the main gate to Camp Pendleton, but he quickly fell asleep again.

When LCpl K.L.M. next awoke, his jeans were unzipped, and the appellant was rubbing his penis. LCpl K.L.M. tried but failed to push the appellant's hand away, so he pulled his knees to his chest and turned toward the car window. In response, the appellant's "hand came out and he started rubbing [LCpl K.L.M.'s] leg."[19] LCpl K.L.M. "started freaking out," yelling, and demanding that the appellant pull over. LCpl K.L.M. climbed out of the car and fell to his hands and knees, still "severely intoxicated."[20] He texted his roommate at 0055: "This fuses [sic] trying to rape me man I need help."[21] At 0058, LCpl K.L.M. called his squad leader.[22] According to his squad leader, a sobbing LCpl K.L.M. told him he accepted a ride home from a corpsman and woke up in the vehicle to the corpsman trying to rape him.[23] When the

---

[14] Corpsman is the common term for Sailors in the Hospital Corpsman rating, such as the appellant.

[15] Record at 391.

[16] *Id.* at 368.

[17] *Id.* at 398.

[18] *Id.* at 371.

[19] *Id.* at 372.

[20] *Id.*

[21] Prosecution Exhibit (PE) 1.

[22] PE 2 at 2.

[23] Record at 341-43.

squad leader next texted at 0124 that he was on his way to help, LCpl K.L.M. replied, "[p]lease hurry."[24]

In between calls, LCpl K.L.M. vomited in the parking lot. The appellant approached him, rubbing his back and leg then his crotch area over his jeans. This time, LCpl K.L.M. immediately removed the appellant's hand, nudging it with his hand and forearm. LCpl K.L.M. remained in the parking lot, waiting, for over an hour. But in phone calls with his squad leader, LCpl K.L.M. repeatedly said, "'[j]ust pick me up.'"[25] When the squad leader finally arrived, LCpl K.L.M. approached him crying, hugged him, and thanked him for picking him up.

The appellant walked up to the car and described LCpl K.L.M. as having "'the strongest case of survivor syndrome that I've ever seen to that extent.'"[26] The squad leader and LCpl K.L.M.'s roommate denied knowing of anything that might explain symptoms of survivor syndrome, post-traumatic stress disorder, or the like in LCpl K.L.M. LCpl K.L.M.'s most recent deployment did not include combat.

The appellant was convicted of: (1) touching LCpl K.L.M.'s thigh and groin with his hand without LCpl K.L.M.'s consent and (2) touching LCpl K.L.M's penis without LCpl K.L.M.'s consent and while LCpl K.L.M. was incapable of consenting because of impairment by alcohol, a condition of which the appellant was aware or reasonably should have been aware. LCpl K.L.M. was very intoxicated when he stirred for the benefit of the gate guard that morning but quickly fell back asleep in the reclined front passenger seat of the appellant's car. Had he been sober, he likely would have awoken to the appellant fumbling for the zipper under the large cowboy belt buckle he was wearing.[27] But he did wake in time to feel the appellant's hand on his penis and physically resist that contact. LCpl K.L.M.'s memories of the circumstances surrounding his allegation of abusive sexual contact are detailed and largely intact. Alcohol-fueled blackouts have not left gaps in his account of events.

---

[24] PE 3.

[25] Record at 346.

[26] *Id.* at 349. The appellant seemed to refer to survivor syndrome as something similar to post-traumatic stress disorder and asked if LCpl K.L.M. had lost close friends.

[27] *See United States v. Clugston*, No. 201500326, 2017 CCA LEXIS 43, at *13-14, unpub. op. (N-M. Ct. Crim. App. 31 Jan 2017) (noting that alcohol may prevent an intoxicated sleeper from waking to the touch and movements of another person as quickly as a sober sleeper would wake).

Although there is no forensic evidence of the appellant's DNA on LCpl K.L.M.'s penis,[28] the evidence corroborating LCpl K.L.M.'s testimony is substantial. The appellant's decision to stop the car supports LCpl K.L.M.'s claim that something unexpected and upsetting happened on the ride back to his barracks. The appellant's explanation that LCpl K.L.M. suffered a severe episode of survivor syndrome, which was rebutted by his roommate and squad leader, suggests the appellant's consciousness of guilt about the need for the sudden stop. LCpl K.L.M.'s excited utterances on the phone and via text message are credible evidence of his sudden distress, the sexual nature of what prompted it, and the sense of vulnerability that prompted him to cry for help.

The appellant argues that shame from an unplanned homosexual liaison was the source of LCpl K.L.M.'s anxiety, but that theory is unpersuasive in this case. Photographs of the parking lot, fronting a main road through Camp Pendleton, show this was not a secluded make-out spot the appellant might have driven to for privacy. If we believe LCpl K.L.M. consented to, then suddenly regretted, sexual contact with the appellant, we must also believe he spontaneously fabricated and executed a dramatic and drawn out cry for help in an intoxicated state. The utter improbability of that prevents it from sowing reasonable doubt in our minds.

We find no reasonable cause to question LCpl K.L.M.'s credibility. The evidence of the appellant's guilt, with regard to the Charge and its two specifications of abusive sexual contact of LCpl K.L.M. for touching his penis and then his thigh and groin, is so overwhelming that we are convinced, beyond a reasonable doubt, that it rendered the subsequent evidence of the sexual assault of Cpl K.I. unimportant and did not contribute to the members' findings of guilty.

*2. Cpl K.I.*

Cpl K.I. and Sergeant (Sgt) B. began drinking beer at breakfast on 1 March 2015. Then they went to a bar in Oceanside, California, and Sgt B. ordered three pitchers of beer to share. Although Cpl K.I. did not remember it, he and Sgt B. moved on to a second bar, where they began drinking mixed drinks. Cpl K.I. did remember meeting the appellant, who was wearing a blue hoodie with "Navy Corpsman"[29] on it and was accompanied by his dog. It was the same bar where the appellant had met LCpl K.L.M. four months earlier.

---

[28] There is no evidence LCpl K.L.M. received a sexual assault forensic exam or provided any clothing for forensic analysis.

[29] Record at 550.

Sometime mid-afternoon, Sgt B., drunk and tired, suggested to Cpl K.I. they find a hotel. The appellant, standing with them, offered to take them to his place to crash. Sgt B. accepted the offer of free lodging. Alcohol diminished Cpl K.I.'s memory of 1 March 2015, but he remembered a car ride, climbing the stairs to the appellant's apartment, and taking a "red drink" from the appellant.[30] Sgt B. remembered accepting drinks from the appellant as well, then lying on the appellant's bed and watching a movie with the appellant until he fell asleep. He remembered Cpl K.I. being in the other room.

Cpl K.I.'s next memory, after accepting the red drink, was of feeling something in his anus. He noticed only that he was lying flat, and it was dark. He fell back into sleep or unconsciousness. When he finally awoke for good, Cpl K.I. realized he was naked. He did not remember undressing. After picking up his clothes from the floor and putting them on, he awoke Sgt B. According to Sgt B., Cpl K.I. was "crying hysterically," telling him he had been raped and needed to get out of there. Outside the apartment, both Sgt B. and Cpl K.I. called friends for rides. By this time, it was late afternoon, after 1700.

Sgt B.'s friend arrived first, and Cpl K.I. climbed into the front seat of her car. Sgt B.'s friend noticed Cpl K.I. crying, and when she approached him, he raised his hands defensively. He would not make eye contact with her, and he hung his head and began to cry again. Sgt. B, his friend, and Cpl K.I. waited until Cpl K.I.'s friend arrived, and then Sgt B. and Cpl K.I. left with him. After accompanying his friend on a couple of errands, Cpl K.I. told his friend what had happened. They went to the naval hospital aboard Camp Pendleton and then to a civilian hospital for a sexual assault forensic exam.

Significant findings arose from the evidence collected during Cpl K.I.'s forensic exam. First, the appellant's semen, identified by his DNA, was on Cpl K.I.'s genitals, around the exterior of his anus, in his mouth, and, in large quantity, on the right side of his chest. There was redness and swelling around the exterior of the anus, interior laceration and broken blood vessels in the anus, and an abrasion on his penis. Finally, at 0545, when the forensic nurse examiner drew Cpl K.I.'s blood, his blood alcohol content (BAC) was measured at .079 and .08. The government and defense toxicology expert witnesses both estimated that, at the time of the alleged assault, Cpl K.I.'s BAC was approximately .26.

The appellant was convicted of penetrating Cpl K.I.'s anus with some object without Cpl K.I.'s consent and while Cpl K.I. was incapable of

---

[30] *Id.* at 552.

consenting because of impairment by alcohol, a condition of which the appellant was or should have been aware. Cpl K.I. remembered the sensation of something penetrating his anus. The forensic evidence proved sexual contact between Cpl K.I. and the appellant. But Cpl K.I. did not remember anything else after he took the red drink from the appellant in his apartment. He did not know how he came to lie naked on his stomach or what penetrated his anus. The forensic evidence proves he was very intoxicated, but we are unable to attribute the gaps in his memory to sleep, unconsciousness, a blackout during which Cpl K.I. might have been active, or some combination of all three states.

Witnesses testified to Cpl K.I.'s genuine fear, anguish, and shame in the hours after he awoke. But the uncertainty of having no memories also contributed to Cpl K.I.'s distress. Cpl K.I. knew only what he had briefly felt in his body and that he awoke naked. He had to infer what happened. Unlike LCpl K.L.M., Cpl K.I. did not know when he fell asleep or under what circumstances. Cpl K.I. never directly observed the appellant committing sexual contact or a sexual act. When he awoke, the appellant was gone. When trial counsel asked Cpl K.I. why he thought he had been sexually assaulted, he replied, "[b]ecause I woke up naked."[31]

Without more direct testimony from Cpl K.I. about waking to a sexual act and his efforts to resist it, the members were forced to examine the testimony about the hours before the alleged assault and look more carefully at Cpl K.I.'s and the appellant's behavior. The appellant went to the bar, in the company of only his dog, and introduced himself to two intoxicated Marines, careful to identify himself as a Navy corpsman. He offered them a ride and a free place to sleep off a day of heavy drinking. Then he offered them more alcohol. For members mining for circumstantial evidence of the appellant's intent, the evidence of his assault of LCpl K.L.M., and the prosecutor's advice to consider that, take on more significance. For this reason, we are not convinced beyond a reasonable doubt that the admission of charged misconduct as propensity evidence and the flawed MIL. R. EVID. 413 instruction did not contribute to the appellant's conviction for sexually assaulting Cpl K.I.

## C. Factual sufficiency of the sexual assault

Before we can remand the charge of sexual assault against the appellant for a rehearing, we must address his claim that the evidence is factually insufficient.

---

[31] *Id.* at 555.

We review the factual sufficiency of evidence *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [appellate court] are themselves convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "By 'reasonable doubt' is not intended a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt." *United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994).

Although alcohol-induced blackouts prevented Cpl K.I. from being as persuasive a witness as LCpl K.L.M., strong forensic and circumstantial evidence leave us with no reasonable doubt about the appellant's sexual assault of Cpl K.I. The appellant lured Sgt B. and Cpl K.I. to his home then plied them with more alcohol. Sgt B. remembered falling asleep while watching a movie with the appellant. Cpl K.I. was in the next room, presumably alone. With a BAC exceeding .26, we are confident Cpl K.I. eventually passed out. Even when disturbed by the sensation of something penetrating his anus, Cpl K.I. could not rouse himself to consciousness. This evidence is sufficient for us to conclude, beyond a reasonable doubt, that alcohol incapacitated Cpl K.I., rendering him unable to perceive and react to what was happening to him.

Forensic evidence revealed that the appellant's penis came into contact with Cpl K.I.'s genitals and anus. His penis breached Cpl K.I.'s mouth. He ejaculated on Cpl K.I.'s chest, explaining the absence of semen from Cpl K.I.'s anus. The appellant felt something penetrate his anus, and the appellant's penis was all over his body, so it is irrational not to conclude he penetrated Cpl K.I.'s anus, with some object, for sexual gratification.

Although we found the propensity evidence in the alleged sexual abusive contact of LCpl K.L.M. likely contributed to the members' findings regarding Cpl K.I., we find the evidence of the appellant's conduct with Cpl K.I. on 1 March 2015 is, by itself, factually sufficient. We are convinced beyond a reasonable doubt that the appellant penetrated Cpl K.I.'s anus with some object, while he was incapacitated by alcohol and without his consent.

**D. Court-Martial order error**

Although not raised by the appellant, the staff judge advocate's recommendation and court-martial order do not reflect that, after the members announced their findings, the military judge consolidated two specifications of abusive sexual contact—Specifications 2 and 4 of the Charge—into a single specification for findings.[32]

We review error in the court-martial order under a harmless error standard. *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998). The appellant has not asserted, and we do not find, that this error materially prejudiced his substantial rights. But the appellant is entitled to a court-martial order that correctly reflects the results of his proceeding. *Id.* We order corrective action in the decretal paragraph.

### III. CONCLUSION

The findings of guilty to the Charge and its Specifications 1, 2, and 4 are affirmed. The supplemental court-martial order shall reflect that Specifications 2 and 4 of the Charge were consolidated into a single specification for findings, which reads:

> In that Hospital Corpsman Third Class Darrius D. Upshaw, U.S. Navy, on active duty, did, at or near Marine Corps Base Camp Pendleton, California, on or about 30 October 2014, commit sexual contact upon Lance Corporal K.L.M., to wit: touching the said Lance Corporal K.L.M.'s penis with his hand:
>
> – By causing bodily harm to him: to wit: an offensive touching, however slight, and
>
> – When the said Lance Corporal K.L.M. was incapable of consenting to the sexual contact due to impairment by a drug, intoxicant, or other similar substance, and that condition was known or reasonably should have been known by the accused.[33]

The findings of guilty to the Additional Charge and its two underlying Specifications and the sentence are set aside. The record of trial is returned

---

[32] The military judge also consolidated two specifications of sexual assault—Specifications 1 and 2 of the Additional Charge—into a single specification for findings, but those findings are set aside.

[33] AE LXVIII at 1.

to the Judge Advocate General of the Navy for remand to an appropriate convening authority with authorization for a rehearing.

Judge RUGH and Judge JONES concur.

For the Court

R.H. TROIDL
Clerk of Court